IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BOBBY JAMES BROWN,

    *Petitioner*,

    v.

UNITED STATES OF AMERICA,

    *Respondent*.

Criminal Action No. ELH-00-0100
Related Civil No.:  ELH-18-2408

**MEMORANDUM OPINION**

This Memorandum Opinion resolves a Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)(i), submitted by defendant Bobby James Brown, who is self-represented.  ECF 437.  Brown was convicted of drug trafficking and related offenses in June 2001.  On August 16, 2001, Judge Andre Davis sentenced Brown to life imprisonment plus 30 years, with credit from June 30, 1999.  ECF 414 at 1, 2-3.[1]  However, in March 2020, I reduced the sentence to 40 years of imprisonment, pursuant to the First Step Act.  *See* ECF 414.[2]

The motion is supported by three exhibits.  ECF 437-1 to 437-3.  In addition, Brown has filed three supplements to the motion.  ECF 441; ECF 467; ECF 482.  I shall refer to all the submissions collectively as the "Motion."  The government has filed an opposition to the motion (ECF 478), accompanied by one exhibit.  ECF 478-1.  Brown has replied.  ECF 479.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant Brown's Motion in part, and reduce his total sentence to 37 years of imprisonment.

---

[1] In the Amended Judgment of April 2, 2020, Brown also received credit for state jail time from May 24, 1999 to May 25, 1999.  *See* ECF 422 at 2.

[2] Judge Davis was elevated to the Fourth Circuit in 2010. The case was subsequently reassigned to Judge J. Frederick Motz. It was reassigned to me on August 7, 2018, due to the retirement of Judge Motz.

## I. Factual and Procedural Background[3]

Brown and several others were charged with drug and firearms offenses in an Indictment filed on March 7, 2000.  ECF 1. [4]  A Superseding Indictment followed on August 8, 2000.  ECF 30.  And, a Second Superseding Indictment was filed on February 6, 2001, charging Brown and four others.  ECF 88.  In particular, Brown was charged in four of eleven counts, as follows: conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, five kilograms or more of cocaine, and 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 and § 841(b)(1)(A) (Count One); and using or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts Six, Seven, and Eight).

Bobby Brown, along with codefendants Julius Brown and Thomas Carter, proceeded to a jury trial that began on April 30, 2001, before Judge Andre Davis.  *See* Docket.  The jury returned its verdict on June 5, 2001.  Of relevance here, Brown was convicted of Counts One, Seven, and Eight, and he was found not guilty as to Count Six.[5]  In addition, the jury made findings as to the drug quantities attributable to Brown.  In particular, it determined that Count One involved 100 grams or more of heroin, 50 grams or more of cocaine base, and no powder cocaine.  *Id.*

Judge Davis conducted sentencing on August 16, 2001.  *See* ECF 397 (Transcript).  At the time of sentencing, defendant was 27 years of age.  *See* ECF 394 at 1.

---

[3] Where appropriate, I have drawn on the factual and procedural background set forth in my Memorandum Opinion of March 16, 2020, resolving Brown's earlier motions.  *See* ECF 414.

[4] As a review of CM/ECF indicates, electronic availability of the court filings does not begin until June 2008, with ECF 267.  However, I previously reviewed the Chambers file retained by Judge Davis.  And, I docketed, under seal, the Presentence Report that I located in Judge Davis's file.  *See* ECF 394.  In addition, at the Court's request, Brown's attorney for his post-conviction motions submitted a copy of the sentencing transcript (ECF 397) and the Statement of Reasons.  ECF 397-1.

[5] Codefendants Julius Brown and Thomas Carter were also convicted of several counts.

Count One, by statute, required a mandatory minimum sentence of ten years' imprisonment, and carried a maximum term of life imprisonment. The Presentence Report (ECF 394, "PSR"), prepared prior to *United States v. Booker*, 543 U.S. 221 (2005), reflected a Sentencing Guidelines range for Count One of life imprisonment. By statute, Count Five required a mandatory, consecutive sentence of five years' imprisonment, and Count Eight required a mandatory, consecutive sentence of 25 years' incarceration.

According to the PSR (ECF 394), Brown had a base offense level of 38 for Count One, the drug conspiracy count, pursuant to § 2D1.1(c)(1) of the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *Id.* ¶ 17. However, in determining Brown's Guidelines range for Count One, the PSR applied the murder cross-reference provision, based on the first-degree murder of Douglas Pennix in 1999. *Id.* ¶ 18.[6] In particular, U.S.S.G. § 2D1.1(d)(1) states: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111, had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1." Judge Davis determined that Brown had a base offense level of 43, pursuant to U.S.S.G. § 2D1.1(d)(1) and § 2A1.1.

Brown also received a four level enhancement under U.S.S.G. § 3B1.1(a) for his role as an organizer or leader in the offense, which involved five or more participants. ECF 394, ¶ 20; ECF 397 at 43. And, Brown received a two-level enhancement under § 3C1.1, for obstruction of justice. ECF 394, ¶ 21; ECF 397 at 44. Given that Brown went to trial, he did not earn deductions for acceptance of responsibility. Thus, Brown had a total offense level of 49 for Count One. ECF 394, ¶ 22. And, as noted, by statute Counts Seven and Eight required mandatory, consecutive sentences of five years and 25 years, respectively, totaling 30 years. ECF 394, ¶¶ 26, 28.

---

[6] Apparently, Mr. Pennix was shot in the back. ECF 397 at 34.

According to the Presentence Report, Brown had a Criminal History Category of V, based on his criminal history points.  ECF 394, ¶ 39.  But, the PSR further determined that Brown qualified as a career offender, for which his Criminal History Category was increased to VI.  *Id.* ¶ 40.  However, Judge Davis rejected the career offender designation and found a Criminal History Category of IV.  *See* ECF 397 at 44; ECF 397-1 (Statement of Reasons) ("The court adopts the factual findings and guidelines application in the presentence report except . . .: Defendant is not a career offender.").

As indicated, Judge Davis applied the murder cross-reference.  ECF 397 at 29-32.  The applicable sentencing Guidelines range for Count One was life imprisonment, with a total mandatory consecutive sentence of 30 years' imprisonment as to Counts Seven and Eight.  ECF 394, ¶¶ 50-51.  Judge Davis imposed a term of life imprisonment as to Count One; a mandatory term of five years, consecutive, as to Count Seven; and a mandatory term of 25 years, consecutive, as to Count Eight.  This resulted in a total sentence for Brown of life imprisonment plus 30 years.  ECF 170.

Brown's conviction and sentence were affirmed on direct appeal.  ECF 215; *United States v. Brown*, 70 F. App'x 99, 104 (4th Cir. 2003) (per curiam).  The Supreme Court subsequently denied certiorari.  *See United States v. Brown*, 540 U.S. 1011 (2003).

On July 19, 2004, Brown filed his first motion to vacate under 28 U.S.C. § 2255.  ECF 217.  Brown supplemented his submission a few weeks later.  ECF 219.  The government filed an opposition.  ECF 220.  Brown replied.  ECF 221.

By Memorandum and Order of April 13, 2006, Judge Davis denied the motion to vacate.  ECF 235; ECF 236.  Brown noted an appeal.  ECF 239.  He also sought a Certificate of Appealability (ECF 240), which Judge Davis denied.  ECF 242.  In a Judgment of December 27,

2006, the Fourth Circuit denied the Certificate of Appealability and dismissed the appeal.  ECF 248.  The mandate issued on April 4, 2007.  ECF 250.

Defendant moved for a sentence reduction on September 8, 2008.  ECF 274.  On September 9, 2008, the Court appointed the federal public defender to make a preliminary review of Brown's eligibility for a sentence reduction based on Amendment 706.  ECF 277.  The public defender subsequently sought to withdraw (ECF 290), and Judge Davis granted that motion.  ECF 291.  And, in an Order of April 13, 2009 (ECF 292), Judge Davis denied ECF 274, *i.e.*, the sentence reduction motion (ECF 274).

Brown again moved for sentence reduction on April 22, 2009.  ECF 293.  Judge Davis denied that motion on the same date.  ECF 294.  The Fourth Circuit affirmed in a per curiam opinion issued on June 25, 2010.  ECF 307.  The mandate followed on July 19, 2010.  ECF 308.

Then, on May 24, 2012, through counsel, Brown filed another motion for reduction of sentence.  ECF 324.  Judge J. Frederick Motz denied that motion on July 25, 2014.  ECF 346.  He stated that Brown was "ineligible for relief under the 'crack' amendments because he was convicted of heroin distribution with a murder cross reference . . . ." *Id.*  Brown moved to alter or amend (ECF 349), and Judge Motz denied that request.  ECF 354.  The Fourth Circuit denied mandamus relief on November 18, 2015.  ECF 358.

Brown subsequently filed three additional post-conviction motions: a motion for retroactive application of the Sentencing Guidelines under 18 U.S.C. § 3582(c) (ECF 364); a motion to vacate under 28 U.S.C. § 2255 (ECF 369); and a motion for a reduced sentence under Section 404 of the First Step Act (ECF 384).  I resolved these motions in a Memorandum Opinion of March 16, 2020.  ECF 414 (Memorandum Opinion); *see also* ECF 422 (Amended Judgment).  In particular, I denied ECF 369, because Brown had not satisfied the threshold requirement for a

successive petition.  But, I granted ECF 364 and ECF 384, in part.

Of relevance here, Brown sought a sentence reduction to 35 years, if the Court declined to hold a plenary resentencing, or a reduction to a total of 24 years, if the Court decided to hold such a plenary hearing.  ECF 414 at 10-11.  Although the government agreed that Brown was eligible for a reduction of sentence under Section 404, it sought a reduction to a total of 70 years.  *Id*. at 11, 13.

I declined to hold a plenary resentencing.  *Id*. at 11.  But, I reduced the sentence for Count One, the only count then subject to revision, from life imprisonment to 10 years.  *Id*. at 15, 18. When combined with the 30-year sentence for Counts Seven and Eight, the defendant's total sentence was reduced to 40 years.  *Id*. at 18.

In addition, I noted that, under the First Step Act's reforms to the 18 U.S.C. § 924(c) "stacking" scheme, discussed *infra*, if sentenced today Brown would face a total of 10 years' imprisonment for Counts Seven and Eight, rather than the 30 years he received.  ECF 414 at 16.  I also recognized that these reforms are not retroactive, and did not compel a sentence reduction for Counts Seven and Eight.  *Id*. at 14.  Nevertheless, I indicated that, in granting the substantial reduction for Count One, I was mindful of the change in the law as to Counts Seven and Eight.  *Id*. at 18.  In other words, I considered that, if defendant were sentenced today, he would not have faced a 30-year, consecutive sentence on those two counts.

On August 19, 2020, about five months after my decision, Brown filed the Motion.  ECF 437.  He seeks resentencing to time served, citing five reasons for extraordinary and compelling grounds under § 3582: the changes to § 924(c); the COVID-19 pandemic; the "trial penalty" he asserts he received for rejecting a plea bargain; his young age at the relevant time; and his record of rehabilitation while incarcerated.  *Id*. at 3-38.  He suggests that a "term of supervised release"

would be an adequate substitute.  *Id*. at 36-38.

The government does not contest that Brown has satisfied the administrative requirements for the Motion.  *See* ECF 437-2; ECF 478 at 17.  But, it opposes the Motion, arguing that Brown lacks any "extraordinary and compelling reason," and that in any case the 18 U.S.C. § 3553(a) sentencing factors do not support a reduction.  ECF 478 at 18-30.

## II. Statutory Framework

The Bureau of Prisons currently indicates that Brown has a projected release date of October 27, 2033.  *See Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Oct. 20, 2021).  Brown seeks compassionate release under 18 U.S.C. § 3582(c)(1)(a)(i).  The changes to the § 924(c) "stacking" scheme are a principal basis for his request.

### A.  Compassionate Release

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the Bureau of Prisons ("BOP").  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)

(observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress enacted the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction

of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.   In U.S.S.G. § 1B1.13, the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  It is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." *See McCoy,* 981 F.3d at 276-77. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy,* 981 F.3d at 276. But, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is

9

the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

In resolving a compassionate release motion, a court must also consider the factors in 18 U.S.C. § 3553(a). *See Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (Mem.) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). And, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

However, as indicated, § 1B1.13 was last updated in November 2018, before the enactment of the First Step Act. It is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and

compelling reason for release that a defendant might raise.'" *Id*. at 284 (quoting *Zullo*, 976 F.3d at 230).

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *Dillon*, 560 U.S. at 827.  But, compassionate release is a "rare" remedy.  *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### B. "Stacking" Under 18 U.S.C. § 924(c)

As to Counts Seven and Eight, the two firearms offenses under 18 U.S.C. § 924(c), Brown was sentenced to a mandatory consecutive term totaling 30 years (360 months).  At the relevant time, a defendant could be sentenced for multiple § 924(c) charges at the same time, even if the convictions were not yet final, resulting in one five-year sentence and a mandatory minimum penalty of 25 years, consecutive, for each subsequent § 924(c) offense.  *See United States v. Jordan*, 952 F.3d 160, 165 (4th Cir. 2020).  As to Brown's two convictions under 18 U.S.C. § 924(c) (Counts Seven and Eight), Judge Davis was required to impose five and 25-year sentences, respectively.

Section 403(a) of the 2018 FSA amended the language of 18 U.S.C. § 924(c)(1)(C) by striking a "second or subsequent conviction under this subsection" and inserting "violation of this subsection that occurs after a prior conviction under this subsection has become final."  Therefore,

the amendment has effectively eliminated the procedure of "stacking" multiple § 924(c) convictions for the purpose of enhancing the penalties associated with "second or subsequent" § 924(c) convictions within the same indictment.  *Id.*  As amended, the enhanced mandatory minimum applies only if the prior qualifying § 924(c) conviction was made final before the new violation occurred.

In other words, the 2018 FSA amended § 924(c), so that it "no longer applies to multiple § 924(c) convictions obtained in a single prosecution." *Jordan*, 952 F.3d at 171.  But, this provision is not retroactive.  *See* 2018 FSA, Section 403(a), (b); *see also Jordan*, 952 F.3d at 172.

As I have previously discussed, if sentencing were held today, Brown would face a maximum of 40 years for Count One (ECF 414 at 13, 15) and a total of 10 years' imprisonment for Counts Seven and Eight, *i.e.*, a total of 50 years.  *See id*. at 16.  And, I took into account the nonretroactive change in the law as to Counts Seven and Eight when I reduced defendant's sentence for Count One from life imprisonment to ten years.  Looking at all the offenses, I concluded that a total sentence of 40 years of imprisonment, rather than life plus 30 years, was appropriate, in light of all the sentencing factors.

### III.  COVID-19[7]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[8]  Defendant filed his motion for compassionate release in February 2021.  At that time, as now, the nation was still "in

---

[7] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[8] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis. This is because, the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Although this country saw a reduction of cases in prior months, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-

breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months"). Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"). But, in recent weeks, the trend has again become more favorable. Nevertheless, as of October 26, 2021, COVID-19 has infected more than 45 million Americans and caused approximately 736,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Oct. 26, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19 to reflect the most available data, most recently in October of 2021. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 14, 2021), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart

conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; and substance use disorders.  *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.

Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, prisoners are not free to follow their own safety rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the Bureau of Prisons

("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[9]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No.

---

[9] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.*  Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since expanded considerably, and the vaccine is now available to all persons twelve years of age and older.  Approximately 66% of the eligible population, and 68% of all persons eighteen years of age and older, is fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times,  https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html  (last visited Oct. 14, 2021).  And, 57% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes

(Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of October 26, 2021, the BOP had 132,741 federal inmates and 36,000 staff.  And, by that date, the BOP had administered 236,067 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Oct. 26, 2021).

As of October 26, 2021, BOP reported that 160 inmates out of a total of 132,741 inmates, and 413 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 42,893 inmates and 8,088 staff have recovered from the virus; and 265 inmates and seven staff members have died from the virus.  Moreover, the BOP has completed 123,969 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Petersburg Medium, where the defendant is imprisoned, the BOP reported that as of October 26, 2021, out of a total of 1,512 inmates, none has tested positive, one has died of COVID-19, and 239 inmates and 22 staff have recovered at the facility. In addition, 388 staff members and 2,153 inmates at the Petersburg complex have been inoculated with the vaccine.   *See*   https://www.bop.gov/coronavirus/,   Federal   Bureau   of   Prisons, https://www.bop.gov/locations/institutions/pem/ (last visited Oct. 26, 2021).

### IV. Discussion

Brown seeks a sentence of time served under § 3582(c)(1)(A)(i).  As noted, he cites five major factors that, in his view, justify a finding of extraordinary and compelling reasons to reduce his sentence.  These include the reforms to § 924(c) and its "stacking" scheme; the COVID-19 pandemic; the "trial penalty" he asserts he received for rejecting a plea bargain; his young age at the relevant time; and his record of rehabilitation while incarcerated.  ECF 437 at 3-38.

The stacking issue has already been described, *supra*.   To summarize, Brown was sentenced to a mandatory consecutive term of 30 years for Counts Seven and Eight, the two firearms offenses under 18 U.S.C. § 924(c), because Count Eight was considered a second conviction requiring a 25-year sentence.   The First Step Act amended § 924(c) so that it no longer applies to multiple § 924(c) convictions obtained in a single prosecution, but did not make this change retroactive.   If sentencing were held today, Brown would face a total of 10 years' imprisonment for Counts Seven and Eight, rather than 30 years.   He argues that this substantial change in sentencing law justifies a sentence reduction.   ECF 437 at 3, 22-30; ECF 482 at 3-5.

The Fourth Circuit's decision in *McCoy*, 981 F.3d 271, is instructive.   In *McCoy*, the Fourth Circuit affirmed several district court rulings reducing stacked § 924(c) sentences under the compassionate release provision.   *Id*. at 274-80.   The Court held that the district courts had properly taken into account, in applying the "extraordinary and compelling reasons" standard, both the "sheer and unusual length of the sentences," and the "'gross disparity' between those sentences and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." *Id*. at 284-86 (internal citations omitted).   "The fact that Congress chose not to make [another section] of the First Step Act categorically retroactive," the Court remarked, "does not mean that courts may not consider that legislative change in conducting their individualized reviews of motions for compassionate release under § 3582(c)(1)(A)(i)."   *Id*. at 286.   The Court also emphasized that the district court decisions reducing the defendants' sentences were the "product of individualized assessments," taking into account the defendants' relative youth at the time of their offenses (between 19 and 24 years), the substantial sentences already served (between 17 and 25 years), and their excellent institutional and rehabilitative records.   *Id*.

In my view, the statutory change for the offenses in Counts Seven and Eight satisfies the

"extraordinary and compelling" prong of the § 3582 analysis.  As noted, "[t]he fact that Congress chose not to make [another section] of the First Step Act categorically retroactive does not mean that courts may not consider that legislative change in conducting their individualized reviews of motions for compassionate release under § 3582(c)(1)(A)(i)."  *McCoy*, 981 F.3d at 286.  Moreover, as part of the § 3553(a) analysis, other judges in this District have considered a change in the penalties that a defendant would face if prosecuted today. *See, e.g., United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Decator*, 452 F. Supp. 3d 320 (D. Md. 2020), *aff'd*, *McCoy*, 981 F.3d 271; *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, 2020 WL 789068, at *2 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, 2020 WL 758525, at *2 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, 2020 WL 586811, at *4 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).  As Judge Bennett explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.'" *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020).

Nevertheless, I must reiterate that I was mindful of this change in the law when I considered defendant's motion under Section 404 of the First Step Act (ECF 384).  I recognized that the First Step Act's changes to § 924(c) were not retroactive.  But, I took into account the change in the law that would now apply to Counts Seven and Eight, and compensated by substantially reducing Brown's sentence for Count One, from life imprisonment to ten years.

The Court next considers whether, if released, Brown would pose a danger to the

community. Relief is appropriate only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government maintains that the § 3553(a) factors support a denial of Brown's Motion. In particular, the government emphasizes the seriousness of Brown's offenses, including the presence of violence, most notably his murder of Douglas Pennix. ECF 478 at 22-23, 26-27. The government also cites Brown's criminal history, as well as his disciplinary infractions in prison and his previous probation violations. *Id*. at 21-24, 28.

For his part, Brown argues that he is a changed man who committed his offenses at a young age and has pursued extensive rehabilitation prison during his lengthy prison sentence. ECF 437 at 4-5, 35-36; ECF 479 at 1-13. He asserts: "There is nothing left to gain by continuing to incarcerate [him]." ECF 479 at 7.

Again, many of these factors were discussed in my previous ruling. ECF 414 at 15-18. On the one hand, Brown was just 27 years old when sentenced. *Id*. at 17. And, Brown was sentenced

to an extremely long prison term of life plus 30 years; were he sentenced today, the maximum sentence for all three counts would be 50 years.  *See* ECF 414 at 15.

I am also mindful of the fact that I previously reduced the sentences of Brown's two codefendants, Julius Brown and Thomas Carter.  *See Julius Brown v. United States*, ELH-00-100, 2020 WL 7425328 (D. Md. Dec. 17, 2020); *Carter v. United States*, ELH-00-100, 2020 WL 1914766 (D. Md. Apr. 17, 2020).   I granted Julius Brown's compassionate release motion, reducing his sentence of life imprisonment plus 30 years to time served (roughly 20 years).  *See* 2020 WL 7425328, at *1, 17.  His circumstances were quite different from those of this defendant, however.  For example, unlike Bobby Brown, he was not charged with the Pennix shooting.  *Id*. at *16.  And, his age (71 years old) and various health conditions put him at an increased risk of severe consequences if he were to contract COVID-19, which anchored my finding of extraordinary and compelling reasons.  *Id*. at *13-14.    As to Carter, pursuant to Section 404, I reduced his sentence from life imprisonment plus 30 years to a total of 35 years.  2020 WL 1914766, at *1, 9.[10]  And, as discussed, *infra*, he is not the one who actually shot Douglas Pennix.

As I have tried to explain, I do not approach this case from a blank slate.  After careful consideration of the case, I previously reduced Brown's sentence from life imprisonment plus 30 years to a total of 40 years—a substantial reduction.  To be sure, "[f]orty years is a long sentence in a system without parole."  ECF 414 at 18.  But, for a defendant in custody since 1999, when he was in his mid-twenties, the difference between a sentence of life imprisonment plus 30 years, and a sentence of 40 years' imprisonment, is obviously life altering.  Nonetheless, about five months later, Brown filed his current Motion.

---

[10] Carter also has a compassionate release motion pending with the Court.  *See* ELH-00-100, ECF 438.

Notably, the Court cannot ignore that, among the defendants, Bobby Brown was arguably the most culpable in the murder of Douglas Pennix. As mentioned, Julius Brown was not charged with the murder. 2020 WL 7425328, at *16. And, in *Carter* I said: "Because [Bobby] Brown was the one who actually shot Pennix, and Carter's Criminal History category was more favorable than Brown's, it is appropriate, in my view, for Carter to receive a revised sentence below the one Brown received." 2020 WL 1914766, at *8.

That said, Brown's reduced sentence of 40 years appears longer than at least some federal sentences recently imposed for drug offenses involving murder. *See, e.g.*, *United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)); United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2018, Fourth Circuit, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/4c18.pdf), *aff'd*, *McCoy*, 981 F.3d 271.

For example, in *United States v. Floyd*, CCB-16-597, Floyd was one of several defendants convicted after a 25-day trial. *See id.*, ECF 477; ECF 491. In particular, Floyd was convicted of racketeering conspiracy that included murders and drug conspiracy. However, he was not the shooter. Although his offense level and criminal history category called for a life sentence, Judge Blake imposed a total sentence of 360 months' imprisonment. *Id.*, ECF 691.

More recently, in *United States v. Antoine*, PWG-19-140, the defendant was involved in a drug trafficking organization in Baltimore and confessed to the intentional shooting and killing of an individual in relation to the drug conspiracy. *See id.*, ECF 349 at 9-10. Pursuant to a plea

agreement, Antoine entered a plea of guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime. *Id*. Although Antoine was the shooter, Judge Grimm imposed a total sentence of 270 months (22.5 years). *Id*., ECF 465.

On the other hand, some sentences approach the sentence here. In *United States v. Whisonant, et al*., ELH-17-191, three of the defendants pleaded guilty to conspiracy to distribute heroin and to discharging a firearm resulting in death, during and in relation to a drug trafficking crime, or to possession of a firearm in furtherance of a drug trafficking crime. One defendant received a total sentence of 360 months imprisonment, another received a sentence of 420 months, and still another received a sentence of 480 months of incarceration. *See id*.

To Brown's credit, he has successfully completed numerous BOP programs and courses, and has been praised in an evaluation from a unit manager. ECF 414 at 17-18; ECF 437-1 at 2-3 (listing education courses); ECF 437-3. Moreover, he has not had any disciplinary infractions since 2011. ECF 437-1 at 3; ECF 478-1. And, he has endeavored to remain involved with his family; several family members previously wrote the Court on his behalf. ECF 414 at 18; ECF 437 at 36; ECF 437-3 at 2-3, 5-8. Perhaps most significant, in his reply brief, Brown writes: "Brown makes no excuses for his past conduct and he acknowledges that he deserved a significant sentence." ECF 479 at 3.

Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see Lancaster*, 2021 WL 1823287, at *3 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402 (4th

25

Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 F. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 F. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

Yet, Brown's crimes were extraordinarily serious. At trial and at sentencing, the government maintained that defendant was a leader of a dangerous drug trafficking organization and that he and his codefendants employed violence during the course of the drug conspiracy. ECF 394, ¶¶ 8, 9. The government claimed that multiple firearms were used during the conspiracy. *See* ECF 393 at 11. Judge Davis found that the defendant was a leader of the drug organization. He was satisfied, by clear and convincing evidence, that application of the murder cross-reference was appropriate under § 2D1.1(d)(1) of the Guidelines. ECF 397 at 29-31.

Brown also has a significant criminal history. According to the PSR, Brown had a Criminal History Category of V, based on points. ECF 394, ¶ 39. This was derived from convictions for a handgun offense in Baltimore City District Court, possession with intent to distribute heroin in the Circuit Court for Baltimore City, and distribution and conspiracy to distribute cocaine in the Circuit Court for Baltimore City. *Id.*, ¶¶ 30-35. At the time of the offense, the defendant was on probation for a felony drug offense. The offense here occurred less than two years after defendant's release from prison for a felony drug offense. *See* ECF 394, ¶¶ 37, 38. And, although Brown has not had a disciplinary infraction since 2011, he accumulated eight infractions between 2002 and 2011, including two for possession of a dangerous weapon. ECF 437-1 at 3; ECF 478-1.

Brown has cited COVID-19 as a basis for compassionate release, but his argument is founded entirely in generic concerns about COVID-19 conditions while incarcerated.  *See* ECF 437 at 32-35; ECF 482 at 8.  He offers no argument, nor any medical records, as to how COVID-19 poses a particular risk to him personally, as opposed to prisoners in general.  And, as the government points out, at 47 years of age, Brown does not fall into a high risk category on the basis of his age.  ECF 478 at 24; *see also COVID-19 Risks and Vaccine Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/aging/covid19/covid19-older-adults.html (last accessed Sept. 13, 2021) ("The risk increases for people in their 50s and increases in 60s, 70s, and 80s.").

However, even without increased risk, Brown's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

In view of the serious nature of Brown's offense, the substantial reduction he already received in my previous ruling, his prior record, his infractions while in custody, and his lack of increased risk due to COVID-19, I conclude that defendant does not qualify for immediate compassionate release. However, considering the changes in the sentencing landscape with respect to § 924(c), the disproportionate length of Brown's sentence, Brown's efforts towards rehabilitation while in custody, his lack of any recent infractions, his age at the time of his offense, and the challenges posed by the pandemic, I am of the view that a 40-year (480-month) sentence

is "greater than necessary" to comply with the purposes of incarceration. 18 U.S.C. § 3553(a).

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *Johnson*, 2020 WL 6063733 (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction in Brown's sentence, from 40 years to 37 years (444 months), is warranted.  As I see it, a sentence of 37 years' imprisonment is "sufficient, but not greater than necessary" to comply with the purposes of incarceration.  18 U.S.C. § 3553(a).

## V.  Conclusion

For the reasons set forth above, I conclude that a total sentence of 37 years (444 months) is "sufficient, but not greater than necessary" to comply with the purposes of incarceration.  18 U.S.C. § 3553(a).

Therefore, I shall grant the Motion (ECF 437) in part, pursuant to the Court's discretionary authority under 18 U.S.C. § 35482(c)(1)(A).  In particular, I shall reduce Brown's sentence for Count Eight from 25 years to 22 years, for a total sentence of 37 years.  I shall adopt all of the previously imposed terms and conditions of supervised release.

An Order follows, consistent with this Memorandum Opinion.

Date:   October 28, 2020                                      _____/s/_____

Ellen L. Hollander
United States District Judge

29